**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
E-mail: jpafiti@pomlaw.com
*- additional counsel on signature page -*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| KARI LATHE, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>                    vs.<br><br>MATTEL, INC., CHRISTOPHER A. SINCLAIR, RICHARD L. DICKSON, KEVIN M. FARR and JOSEPH B. JOHNSON,<br><br>                              Defendants | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Kari Lathe ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys,

1

which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mattel, Inc. ("Mattel" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Mattel between October 20, 2016 and April 20, 2017, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Mattel, Inc. designs, manufactures, and markets a broad variety of children's toy products on a worldwide basis. The Company sells its products to retailers and directly to consumers. Mattel's products include branded fashion dolls, infant and preschool products, toy cars, and electrical vehicles.

3.    Founded in 1945, the Company is headquartered in El Segundo, California. Mattel's stock trades on the NASDAQ under the ticker symbol "MAT."

4.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) prior to and during the Class Period, Mattel's retail customers were loaded with extremely high levels of unsold Mattel product; (ii) as a result of Mattel's unusually high levels of unsold inventory at its retailers, Mattel was exposed to the heightened risk that it would have to issue its retailers financial concessions (in the form of sales adjustments, discounts and promotions) to remove such excess inventory, as well as the heightened risk that Mattel would experience slower sales growth in future periods; and (iii) as a result of the foregoing, Mattel's public statements were materially false and misleading at all relevant times.

5.    On April 20, 2017, post-market, Mattel issued a press release announcing its Q1 2017 financial results for the period ending March 31, 2017.

6.    For the quarter, the Company reported that, on a year-over-year basis, worldwide net sales and gross margins each declined by more than 15%, and its operating loss increased by more than 158% to $127.0 million from $49.1 million.

7.    Mattel's Q1 2017 results took securities analysts by surprise and were significantly below Wall Street consensus estimates. In fact, Mattel's 15% net sales

3

decline during the quarter was twice the 7.8% decline expected by Wall Street analysts and its reported Q1 2017 gross margins were 520 basis points less than expected Wall Street consensus estimates. Moreover, Mattel's revenue decline during Q1 2017 was well above the "mid to high single digit[]" decline propounded by defendant Farr at Mattel's Toy Fair on February 17, 2017, when Q1 2017 was more than half complete.

8.    Mattel's newly appointed CEO, Margaret H. Georgiadis, commented on the Q1 2017 results, stating, in pertinent part, as follows:

> **"Our Q1 results were below our expectations due to the retail inventory overhang coming out of the holiday period**, but we remain encouraged by strong performance at retail for our key core brands, including Barbie, Hot Wheels and Fisher-Price as well as sustained momentum in high-growth markets like China . . . . We are confident we have worked through the majority of this overhang and look forward to a strong launch of Disney's Cars 3 theatrical release in the second quarter. While we have a lot of work to do to successfully position Mattel for the future, we see a clear runway to improving growth and profitability over time."

(Emphasis added.)

9.    After the issuance of the Q1 2017 earnings release, Mattel held a conference call with securities analysts and investors. During the conference call, defendant Farr stated, in pertinent part, that "[w]hat we didn't expect was ***the prolonged impact from the retail inventory overhang and the resulting slower pace of reorders by retailers, with sales in North America and Europe particularly impacted."*** (Emphasis added.)

10.    Upon these revelations, the price of Mattel stock fell nearly 14%, or $3.42 per share, on heavy trading volume to close at $21.79 per share on April 21, 2017.

11.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

14.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Mattel's principal executive offices are located within this Judicial District.

15.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.    Plaintiff, as set forth in the accompanying Certification, purchased common shares of Mattel at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

17.    Defendant Mattel is incorporated in Delaware.  The Company's offices are located at 333 Continental Boulevard, El Segundo, California 90245.  Mattel's shares trade on the NASDAQ under the ticker symbol "MAT."

18.    Defendant Christopher A. Sinclair ("Sinclair") was the Company's Chief Executive Officer ("CEO") and Chairman of its Board of Directors until February 8, 2017, when defendant Sinclair resigned from his position as Mattel's CEO and became Executive Chairman of the Company's Board of Directors.

19.    Defendant Richard L. Dickson ("Dickson") has served all relevant times as the Company's President and Chief Operating Officer.

20.    Defendant Kevin M. Farr ("Farr") has served at all relevant times as the Company's Chief Financial Officer.

21.    Defendant Joseph B. Johnson ("Johnson") has served at all relevant times as the Company's Senior Vice President and Corporate Controller.

22.    The defendants referenced above in ¶¶ 18-21 are sometimes referred to herein collectively as the "Individual Defendants."

23.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared

thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

24.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Mattel securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Mattel's business, operations, management and the intrinsic value of Mattel securities; and (ii) caused plaintiff and other members of the Class to purchase Mattel securities at artificially inflated prices.

**SUBSTANTIVE ALLEGATIONS**

**<u>Background</u>**

25.     Mattel designs, manufactures, and markets a range of toy products worldwide. Mattel's portfolio of brands and products (referred to collectively herein as "products") are currently grouped by the Company into the following four major brand categories:

> *Mattel Girls & Boys Brands* – including Barbie® fashion dolls and accessories ("Barbie"), Monster High®, Ever After High®, Polly Pocket®, and DC Super Hero Girls™ (collectively "Other Girls"), Hot Wheels® and Matchbox® vehicles and play sets (collectively "Wheels"), and CARS®, DC Comics®, WWE® Wrestling, Minecraft®, Max Steel®, BOOMco.®, Toy Story®, and games and puzzles (collectively "Entertainment").

> *Fisher-Price Brands* – including Fisher-Price®, Little People®, BabyGear™, Laugh & Learn®, and Imaginext® (collectively "Core

7

Fisher-Price"), Thomas & Friends®, Dora the Explorer®, Mickey Mouse® Clubhouse, and Disney Jake and the Never Land Pirates® (collectively "Fisher-Price Friends"), and Power Wheels®.

*American Girl Brands* – including Truly Me®, Girl of the Year®, BeForever®, Bitty Baby®, and WellieWishers™. American Girl® Brands products are sold directly to consumers via its catalog, website, and proprietary retail stores, as well as sold directly to certain retailers.

*Construction and Arts & Crafts Brands* – including MEGA BLOKS® and RoseArt®.

26.    The majority of Mattel's products are sold to a relatively small retail customer base, with direct sales to retailers in the United States and Canada accounting for approximately one-half of Mattel's gross revenue. During the fiscal year ended December 31, 2016, Mattel's three largest customers, Wal-Mart Stores, Inc., Toys "R" Us, Inc. and Target Corporation, collectively accounted for approximately 39% of its net revenue, and its ten largest customers accounted for approximately 49% of its total net sales. In addition, the Company's business is highly seasonal in nature, with the majority of its retail sales occurring during the September through December timeframe.

27.    In the years just prior to the Class Period, Mattel underperformed its peers. As an illustration, during 2013, Mattel generated an operating profit margin of 18%, or 300 basis points better than its closest peer, Hasbro, Inc. ("Hasbro"). Just two years later, however, Mattel's 2015 operating profit margin declined by nearly 50% to 9.5%. This decline in the Company's operating profit margin largely resulted from deteriorating sales and gross margins, as well as higher promotional spending levels, as Mattel's products failed to resonate with consumers.

28.     Defendants Sinclair and Dickson took control of the Company's management in the spring of 2015 and embarked on an effort to turn the Company's business around.

29.     As detailed herein, at the start of the Class Period, Mattel announced its financial results for the quarter ended September 30, 2016 ("Q3 2016"). For Q3 2016, Mattel reported gross sales of $1.98 billion, in line with the prior-year period, and operating income of $317.4 million, approximately 6% better than the comparable prior-year period.

30.     Unbeknownst to investors, Mattel's favorable Q3 2016 results were the result of the Company's loading up its retail customers with excess product in advance of the 2016 holiday selling season. Thereafter, during the 2016 fourth quarter ("Q4 2016"), Mattel was forced to issue large amounts of so-called "sales adjustments," including trade discounts and other allowances, and boost promotional spending to help retailers clear bloated levels of Mattel inventory. These sales adjustments had a material adverse effect on the Company's operating results during Q4 2016. Indeed, the magnitude of the sales adjustments issued by Mattel during Q4 2016 is illustrated in the following chart:



31.     When defendants announced the Company's 2016 year-end results, they disclosed that Mattel's year-over-year worldwide net sales (gross sales after sales adjustments) for Q4 2016 ***declined by 8%,*** its gross margins ***declined by 14%*** and its operating income ***declined by 11%*** due to extraordinary sales adjustments and promotional costs incurred by the Company during Q4 2016 to help clear the known, but undisclosed, massive pre-existing build-up of Mattel inventory in its retail channel. Indeed, at the end of the Class Period, Steven Totzke, Mattel's Executive Vice President and Chief Commercial Officer, publicly stated that he receives "live feedback" on the state of Mattel's inventory level, thereby acknowledging that defendants knew of the level of Mattel's products in the retail channel prior to and during the Class Period.

32.     On January 25, 2017, when Mattel announced its Q4 2016 and year-end results, defendants, as detailed herein, disclosed adverse facts associated with the

Company's inventory and the price of Mattel stock fell approximately 18%, or $5.57 per share, on heavy trading volume to close at $25.99 per share.

33.    Defendants, however, continued to mislead the market by downplaying the significance of the amount of retail inventory existing at the end of Q4 2016. Defendants misleadingly characterized the remaining retail inventory at the end of Q4 2016 as being "moderately," i.e., not extremely or excessively, elevated, and told investors that such inventory was within in "a manageable range." Indeed, defendant Sinclair told investors that Mattel had just a "little bit of inventory in some pockets" to work through.

34.    After the market closed on April 20, 2017, Mattel announced its operating results for the 2017 fiscal first quarter, the period ended March 31, 2017 ("Q1 2017"). The Q1 2017 results were significantly less than Wall Street securities analysts' consensus estimates due to a "retail inventory overhang coming out of the holiday period." In fact, Mattel's newly appointed CEO, Margaret Georgiadis ("Georgiadis"), who succeeded defendant Sinclair, noted that retail inventory levels during Q1 2017 were such that they had a "prolonged impact" on customer reorders.

35.    In response to these revelations, the price of Mattel stock fell approximately *14%,* or $3.42 per share, on heavy trading volume to close at $21.79 per share on April 21, 2017.

36.    Indeed, at the beginning of the Class Period, securities analysts tried to gauge the extent to which Mattel's retail channel was supplied with inventory by

questioning defendants about product shipments to retailers and retailer point-of-sale ("POS") data, as a comparison of these metrics would help investors discern whether Mattel inventory in its retail channel was increasing, decreasing or remaining constant.

37.    In response to such inquires, defendants falsely represented that Mattel's shipments to retailers and retailer POS data were balanced, or "aligned," which created the illusion that Mattel's inventory in the retail channel was not increasing.

38.    In truth, however, retailers were bloated with Mattel's products, as shipments of the Company's goods to retailers far exceeded retailer POS data. Unable to gauge the extent to which retailers were supplied with inventory, investors could not discern the true risk that Mattel would have to issue its customers sales adjustments or other financial concessions to help them clear bloated inventory levels, or the extent to which such inventory levels would adversely affect the Company's future sales growth.

### Materially False and Misleading Statements Issued During the Class Period

39.    The Class Period begins on October 20, 2016, a day after Mattel issued a press release entitled "Matter Reports Third Quarter 2016 Financial Results and Declares Quarterly Dividend," announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q"). For the quarter, Mattel reported that its worldwide net sales were up 2% year- over-year, on a constant currency basis, and its operating income had increased 5.5% over the comparable prior-year

period. Defendant Sinclair commented on Mattel's Q3 2016 financial results and Q4 2016 outlook, stating, in pertinent part, as follows:

> "In the third quarter, ***we continued to make solid progress against our strategic priorities***, and we are pleased with our momentum as we head into the holiday season . . . . Our core brands continue to show improved strength and vibrancy, contributing to very encouraging and broad-based top-line momentum. And we continued to manage costs effectively, while making important investments in brand building, commercial excellence and emerging market expansion. Overall, our strategies are generating good progress on many fronts, and while we still have a critical fourth quarter to execute, ***we remain broadly on track to deliver on our full-year outlook***."

(Emphasis added.)

40.    On the same day, Mattel held a conference call with analysts and investors to discuss Mattel's Q3 2016 operating results. During the conference call, defendant Sinclair suggested normal inventory levels existed in the Company's retail channel, announcing that "consumer takeaway [was] aligning nicely with shipping," and stated, in pertinent part, as follows:

> So let me begin by saying that in the quarter, we continued to make some very good progress across all of our strategic priorities. ***We were especially encouraged by the momentum of our top line where our positive consumer takeaway [sales] is aligning nicely with [Mattel's] shipping.*** This increases our confidence as we get set for the holiday season and as we look to deliver on our challenging 2016 topline objectives.

(Emphasis added.)

41.    During the conference call, defendant Dickson then reinforced the notion that inventory in the retail channel was at ordinary levels by stating that Mattel's gross sales, i.e., customer product shipments, were "aligned" with retail POS data, stating, in pertinent part, as follows:

As you know, ***POS is the true barometer of a brand's success*** with shipping ultimately aligning to it over time. And our turnaround efforts focusing on consumer demand creation and better global commercial alignment are clearly gaining traction.

Excluding the impact of Disney Princess, global POS continues to be up mid-single digits for the quarter and year to date with solid results across the majority of our brands. ***And gross sales, excluding Disney Princess, are aligned to POS*** with sales in constant currency up low double digits for the quarter and up high-single digits year to date.

(Emphasis added.)

42.     Similarly, during the conference call, defendant Farr stated that product shipping during Q3 2016 was "better aligned" with positive retail POS, helping to position the Company to execute and deliver its financial objectives during Q4 2016, stating, in pertinent part, as follows:

Thank you, Richard, and good afternoon, everyone. Overall, our third-quarter results met expectations with ***shipping better aligned with positive POS***, which positions us well to execute the fourth quarter and deliver our challenging top-line objectives for the year. We continue to focus on managing the P&L, leveraging sales and POS momentum, and cost savings initiatives to help offset continued ForEx headwinds and short-term mix challenges.

(Emphasis added.)

43.     Concerning Mattel's outlook, defendant Farr stated that "we don't see any significant changes to our full-year 2016 outlook," noting, in pertinent part, as follows:

Looking ahead as Chris said, as we enter the fourth quarter, ***we don't see any significant changes to our full-year 2016 outlook***. We have a lot of work to do to execute the fourth quarter and our focus remains on delivering operating profit by balancing our top-line and managing the middle of the P&L. As expected, the unfavorable impact of ForEx did lessen in the third quarter, which we believe will continue.

And given our third-quarter results, our revenue outlook has not changed. We've gained confidence with our results to date and believe we are well positioned to meet our challenging 2016 revenue objective of relatively flat net sales in constant currency.

14

At the same time, ***we will work hard to achieve a full-year gross margin of about 48.5%***. This continues to be an important area of focus as we still face ForEx and mix headwinds but we do expect to be in the range of this target. ***It means that we need to achieve a fourth-quarter gross margin rate around 51%, which is a challenge, but well within the ranges we have achieved in the past. The sequential improvement in gross margin is supported by incremental volume, improved mix from stronger trends in our girls properties*** with American Girl, Barbie, and DC Superhero Girls, a smaller Disney Princess impact, and by incremental flow-through from our supply chain and other cost savings initiatives.

(Emphasis added.)

44.    During the conference call's Q&A session, defendant Farr reiterated defendants' confidence in Mattel's ability to achieve its 2016 gross margin objective of 48.5%. The following exchange, in pertinent part, transpired:

[Felicia Hendrix – Barclays Capital – Analyst:] Okay, thank you. ***So just sticking on the topic of gross margins***, and Kevin, you kind of gave color and we could have backed into what you need to be for the fourth quarter and you kind of highlighted that it's challenging. But just given all of the inputs, the puts and takes to get to that number ***for the fourth quarter*** taking into consideration there's challenging [sic], I was just wondering how comfortable are you with your full-year gross margin outlook, like what could go wrong[?].

[Defendant Farr:] Yes, I think with regard to we don't control things like ForEx [sic], and there's a lot of moving pieces like mix but when we look at it ***we feel pretty confident with regard to the 48.5% target***, and we're working hard to achieve that and it's difficult to predict but we are working on a lot of the moving pieces including ForEx, mix, and incremental revenues, and we also expect to improve mix from our girls properties, American Girl, Barbie, and Disney or DC Superheroes. There is going to be a smaller impact from Disney Princess, and then we do see incremental flow through from our supply chain and other cost savings initiatives.

(Emphasis added.)

45.    On October 27, 2016, Mattel filed with the SEC its Form 10-Q for the quarter ended September 30, 2016 (the "Q3 Form 10-Q"), which was signed by defendant Johnson. The Q3 Form 10-Q falsely represented that "[t]here have been no

15

material changes to the risk factors disclosed under Part I, Item 1A 'Risk Factors' in Mattel's 2015 Annual Report on Form 10-K." This representation was materially false and misleading as the Q3 Form 10-Q failed to disclose the heighten financial risk associated with bloated retailer inventory levels, including the risk that Mattel may have to incur incremental costs to clear such inventory and the extent to which such inventory levels would adversely impact Mattel's future sales growth.

46.    In the Q3 Form 10-Q, the Company stated, in relevant part:

>    As of September 30, 2016, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. The scope of Mattel's assessment of the effectiveness of its disclosure controls and procedures does not include any disclosure controls and procedures of Fuhu or Sproutling, which were acquired in January 2016, that are also part of Fuhu and Sproutling's internal controls over financial reporting. This exclusion is in accordance with the SEC's general guidance that a recently acquired business may be omitted from the scope of the assessment in the year of acquisition. Based on this evaluation, Christopher A. Sinclair, Mattel's principal executive officer, and Kevin M. Farr, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of September 30, 2016.

47.    The Q3 Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Sinclair and Farr, stating that the financial information contained in the Q3 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

48.    On November 3, 2016, defendants held Mattel's 2016 Analyst Day with investors and securities analysts ("Analyst Day"). During the Analyst Day, defendant Sinclair expressed confidence in the Company's ability to drive "sustainable profitable growth," in part, due to its improving and growing shipping performance and retailer POS, stating, in pertinent part, as follows:

> *[T]oday's Mattel is confident, aligned and focused on driving sustainable profitable growth* and on building value for our shareholders.
>
> From our efforts to transform this company, *a new foundation has been set.* And I think it's fair to say that *Mattel's strategy* to reenergize its creative culture and to align its global commercial organization around refocused brand management and revitalized strategic partnerships *is working. And it's showing up in our results.*
>
> *Our POS and shipping are significantly improved and growing.* Our core brands are building strength. Our Toy Box is accelerating led by a vibrant slate of entertainment properties. We're increasing our space, merchandising and support with many of our key retail and online customers.
>
> We're also driving excellent growth in big emerging markets like China and Russia. And we've significantly improved our cost structure.
>
> And finally, we're effectively managing our P&L and balance sheet as we reinvest in growth, compensate for significant headwinds and foreign exchange [and] the loss of Disney Princess and support our dividend. Because of this momentum and of the foundation that we're building, *I can say with a degree of confidence that we're poised for much more improved growth and a better outlook in '17 and beyond.*
>
> *Over the balance of this morning, I hope that we can impart some of that same sense of confidence in all of you.*

(Emphasis added.)

49.    Defendant Sinclair later highlighted the power of Mattel's brand portfolio to offset any revenue lost from the 2015 expiration of the Company's global rights to

17

produce and sell toys based on Disney Princess® characters, stating, in pertinent part, as follows:

> Consider the fact that despite the loss of Disney Princess, ***we're clearly on track to fully offset that shortfall by the end of this year.*** To put that in perspective, that's essentially like creating a top 10 toy company in just one year's time. A true testament to the power and diversity of our brand portfolio and of our ability to execute effectively as a company.

(Emphasis added.)

50.    In addition, defendant Dickson stated that Mattel's relationships with its retail partners were creating "great in-store executions," as validated by "positive and improving POS results," stating, in pertinent part, as follows:

> We have made significant strides in our relationships with our retail partners, which are not only resulting in increased shelf space but also allowing us to create great in-store executions.
>
> ***Our positive and improving POS results are proof that this is working. And we're taking in-store execution to a whole other level*** with our new American Girl shop within a shop here at Toys "R" Us and we'll look to use that model to build the bigger presence with our other brands in the near future.

(Emphasis added.)

51.    Defendant Farr also made materially false and misleading statements about the Company's operations. First, defendant Farr stated that, based, in part, on "strategic pricing" and other initiatives, Mattel was on track to deliver an approximate 48.5% gross margin for 2016, stating, in pertinent part, as follows:

> And as expected, gross margin was down in the third quarter primarily due to currency and mix, but these headwinds are being partially offset by significant cost savings, and while we expect foreign exchange to continue to lessen in the fourth quarter as it did in the third and mix to improve slightly.

***In the fourth quarter, we continue to rely on strategic pricing***, cost savings and supply chain ***initiatives*** to partially offset the impact of forex and mix. Despite these headwinds, ***we remain on track to deliver a gross margin of about 48.5% for the full year.***

(Emphasis added.)

52.    Defendant Farr then stated defendants expected to see improvements in the Company's 2017 gross margins, as Mattel "grow[s] significantly in 2017," stating, in pertinent part, as follows:

However, we do plan on seeing year-over-year improvement in gross margin percentages despite potential challenges with mix.

We expect gross margins to improve in 2017 versus 2016 due to improved scale relative to our fixed supply chain cost base as we grow significantly in 2017, a stronger performance by our girls portfolio driven by Barbie, American Girl, and DC Superhero Girls, and improving margin structure for MEGA, as we invest in manufacturing and gain scale. And the opportunity to strategically price our portfolio particularly in international markets where currencies have weakened significantly over the past couple of years.

53.    In addition, defendant Farr stressed that efficiencies in sales adjustments, i.e., trade discounts and other allowances, inventory management and advertising spending would improve operating margins, stating, in pertinent part, as follows:

Turning to our P&L levers to improve operating margins for 2017, we should continue to be efficient in our sales adjustments, which we are targeting to be in our historical range of 9% to 9.5%. With growing revenues, we'll be building out a better retail fulfillment strategy to optimize retail inventory positions and our owned inventory positions.

Better demand planning and sourcing systems would help ensure that the right inventory is in the right place at the right time, which should improve the efficiency of our sales adjustments. And we expect foreign exchange to be less of a headwind in 2017, but our path to get back to gross margins of around 50% will likely extend beyond 2017.

***

***Like sales adjustments, we should continue to be efficient in our advertising*** and look to target spending on the lower end of our historical range of 11% to 13%.

19

As I mentioned, we have a very strong entertainment lineup in 2017 so we'll not need to spend as much on advertising those licenses compared to our owned I.P.

(Emphasis added.)

54.    During the Analyst Day Q&A session, defendant Dickson issued positive statements about Q4 2016 and retail POS data for the Company's all important Barbie brand, stating, in pertinent part, as follows:

[Unidentified Audience Member:] Can you comment on Barbie POS trends in the fourth quarter so far?

[Defendant Dickson:] Well, *so far so good. We've been quite pleased with Barbie's trend throughout the year* for those tracking along which is a good group to say that to. . . . [T]he U.S. started out, I think, with a lot more momentum than the rest of the world as we indicated the rest of the world was catching up to all the marketing plans and some of the rollouts of the specific new refreshed product and as we've seen the rest of the world get traction overall, *now we're really quite pleased with Barbie's POS performance.*

We are heading into what was, last year, a very good POS here for Barbie and so we are lapping and planning to lap a pretty aggressive POS season. That being said, as you see and feel, *we've got momentum behind the brand*. We've got renewed purpose around how we market the brand and how we speak to the brand, not only to consumers, but we've got retailer confidence, we've got increased shelf space.

We've implemented, if you will, media strategies surgically around the balance between traditional TV and digital.

(Emphasis added.)

55.    On January 25, 2017, Mattel issued a press release announcing its Q4 2016 and year-end financial results for the period ending December 31, 2016.

56.    For Q4 2016, the Company reported that, on a year-over-basis, worldwide net sales *declined by 8%* to $1.83 billion, gross margins *declined by 14%* to 47.0% and operating income *declined by 11%* to $262.6 million. (Emphasis added.)

20

57.    Later that day, Mattel held a conference call with analysts and investors ("Q4 conference call") to discuss Mattel's Q4 2016 and year-end financial results. During the Q4 conference call, defendant Sinclair stated that Mattel's gross margins were "significantly impacted by elevated sales adjustments and by heavier discounting," which, in turn, had adversely impacted the cash generated by Mattel's operations. Defendants also acknowledged that high levels of sales adjustments and discounting were necessary to liquidate excess inventory in the retail channel.

58.    In response to these revelations, the price of Mattel stock fell approximately 18%, or $5.57 per share, on heavy trading volume to close at $25.99 per share on January 26, 2017.

59.    Defendants, however, continued to mislead investors. First, defendant Sinclair misleadingly attributed the Company's worse than expected Q4 2016 operating performance to "industry-wide challenges," including a significant slowdown in the U.S. toy category for the holiday period, stating in the press release, in pertinent part, as follows:

> "Our results were negatively impacted by a number of industrywide challenges, including a significant U.S. toy category slowdown in the holiday period, and increased forex headwinds . . . . And while our sales at retail remained strong, the slowdown triggered elevated retail promotional activity and decreased shipping, all of which had a significant impact on our gross margin." . . .

> "Even against this difficult backdrop, our core brands continued to show solid growth, and our performance in key emerging markets like China was equally strong. And, importantly, we offset a substantial revenue gap from the loss of the Disney Princess license. Looking forward, we remain broadly optimistic about Mattel's performance in 2017 and beyond. Our core brands are strong and growing, we have a

21

solid lineup of entertainment properties in the pipeline, and we are forging valuable relationships with key retail partners throughout the world."

60.    As illustrated in the following chart, however, defendant Sinclair's "industry-wide" pretext for Mattel's Q4 2016 performance is belied by the 2016 fourth quarter financial results reported by Hasbro, Mattel's closest peer:

**Mattel Inc. and Hasbro Inc.**
Reported Key Financial Metrics
2016 Fourth Quarter

|                   | Mattel  | Hasbro |
|-------------------|---------|--------|
| Net Sales         | -8.27%  | 11.23% |
| Gross Profit      | -14.16% | 8.13%  |
| Operating Income  | -10.71% | -1.35% |

61.    Significantly, defendants continued to mislead the market by downplaying the continuing risks associated with Mattel's existing retail inventory levels at the end of Q4 2016.

62.    On the Q4 conference call, defendants characterized retail inventory levels as being "moderately," i.e., not extremely or excessively, elevated, and explained that such inventory was within "a manageable range."

63.    During the Q&A session, defendants were questioned about the financial impact of the lingering excess inventory on Mattel's operating performance in the short run, which defendants Sinclair and Farr misleadingly downplayed, stating that the inventory levels were at a "balancing point" and that excess inventory would be "quickly" eliminated. The following exchange, in pertinent part, transpired:

[Greg Badishkanian – Citi – Analyst:] So, do you think you'll end Q1 with normalized inventory levels? And then, how much do you think the accelerated sales adjustments in Q1, how much will that impact Q1, if at all? And if you think that will continue into second quarter, assuming you have too high inventories entering into the second quarter? So, when will this kind of discontinue, in terms of the promotions, discounts, et cetera?

[Defendant Sinclair:] Greg, I think *I would expect we'd be in pretty decent shape on inventory as we get through the first quarter, and it's really in pockets. So, this is not a horrendous issue at this point.*

But as far as the allowances and discounting, I think we expect that to kind of be back to normalized levels at this point. And remember, a lot of that is actually being used not for pure discounting; it was to help accelerate some shipments. And so, I think that's sort of reached sort of a balance point with the major retailers. And I'd say most of them are fairly comfortable with where they're at right now, and the exit POS certainly helped everybody.

[Defendant Farr:] And I'd just like to add on. Sales were below expectations, but our owned inventory is of good quality. We've got mostly good brand POS momentum exiting the year. *And we'll work through the extra inventory quickly*, and I don't think we have to discount it.

(Emphasis added.)

64.    Defendant Farr noted further that "the moderately high level of year-end retail inventories will likely reduce our revenues in the first quarter and have less than a 2% impact for the full year of 2017." When a securities analyst sought additional clarification on this comment, defendant Sinclair deceptively stated, in pertinent part, that "we do have to work off a little bit of inventory in some pockets":

[Tim Conder – Wells Fargo Securities – Analyst:] Just to follow on a little bit on the prior question here. I think you had said previously regarding 2017 top line outlook – and granted, Chris, what you just said, that the base bar has been lowered here – but I think previously you had said somewhere up between mid- and high-single digits. And then, Kevin, in your comment you said you see 2017 being impacted less than 2% for a full year.

So, was that reference point up mid- to high-single digits for year-over-year growth and now you're saying that range comes off less than 2%? Is that the proper way we should hear what you're saying?

[Defendant Sinclair:] I think that's probably a fair way to look at it, Tim. We're still confident that we're somewhere in the mid to the up-middle range of growth. ***But we do have to work off a little bit of inventory in some pockets.*** That's probably more of a first quarter issue, but obviously it affects full year.

(Emphasis added.)

65. On January 30, 2017, Moody's put Mattel's credit on review for downgrade citing discounting at retail that contributed to narrowed profit margins and lower cash flow.

66. On February 17, 2017, Mattel held its Toy Fair conference call with securities analysts and investors. During the conference call, defendant Farr falsely and misleadingly stated that "[w]e expect first quarter revenues to be done [sic] [down] mid to high single digits as a result of the elevated retail inventory at year-end 2016," and that first quarter gross margin would also be down "moderately" due to the foreign exchange headwinds and some targeted inventory cleanup.

67. Also during the Toy Fair presentation, Steven Totzke, Mattel's Executive Vice President and Chief Commercial Officer, represented to investors that he receives "live feedback" on the state of Mattel's inventory, stating, in pertinent part, "I get a lot of ***live feedback*** on the state of our space, and our product placement and ***our inventory levels.***"

68. On February 21, 2017, Mattel held the Q&A session of the Toy Fair conference call with securities analysts and investors. During the conference call,

24

defendant Sinclair acknowledged that Mattel loaded up the retail channel in advance of Q4 2016 based upon "a pretty positive set of plans" for the quarter and later engaged in "discounting to support shipping and tried to move product off of retail," stating, in pertinent part as follows:

> Let me begin by sort of once again saying that, clearly, we had a difficult fourth quarter and we are disappointed with the results, which we found to be more difficult than anticipated. Essentially, *what we had done is we had built a pretty positive set of plans for the fourth quarter based on the assumption that we would maintain the strong momentum we had in POS leading into the fourth quarter.*
>
> ***
>
> *We obviously got into discounting to support shipping and tried to move product off of retail.* At the same time that that was occurring, we faced another fairly big headwind, which was some of our international currencies. Particularly, the euro and the Mexican peso deteriorated fairly significant starting in November after the US election. So we kind of faced a perfect storm, if you will. We had two things coming together. And obviously, the fourth quarter was not what we anticipated.
>
> But I said again on Friday, look, we own the results. We think we made the right decisions at the time to try to get our shipments in and try to get product moving at retail. But clearly, it cost us financially. So net, not where we expected to be or wanted to be in the quarter.

(Emphasis added.)

69. Then, in response to an analyst's question on the state of the Company's business in Europe, defendant Sinclair falsely and misleadingly represented that in Europe, Mattel was "in reasonably good shape" and "fairly healthy in terms of inventory." The following exchange, in pertinent part, transpired:

> [Linda Bolton Weiser - B. Riley & Co. – Analyst:] Thank you. So when you reported the fourth-quarter results, there was a lot of discussion around the significant increase in sales adjustments in North America. But when you really look at the results, the adjustment in North America was only about 2%, but it was actually quite a bit larger in Europe and Latin America. So, *could you give us a little bit*

25

*of state of the union kind of on those regional markets* and how you ended the year and also, on a longer-term basis, where you think the opportunities are and how you are competitively in those markets?

[Defendant Sinclair:] I'll take a shot at that one, Linda. Your assessments are completely accurate. The issues started here in North America with a slowdown, and that's where we sort of first responded. But it was almost simultaneous. We saw the same trends in Europe, and even Latin America showed some softening as well as Australia.

I'd say we were probably better positioned here in the US, frankly, as we got into trying to get product into the stores and discounting, than we were in Europe. Europe, because Disney Princess was a much bigger factor, frankly, we probably had less in our arsenal (technical difficulty) work with. So I think we scrambled across the board. It was a combination of Europe, North America, and parts of Latin America where the sales get elevated discounting.

**On balance, though, I think we came out in Europe in reasonably good shape. Our trends were good. Our business there is fairly healthy in terms of inventory.**

(Emphasis added.)

70.    On February 23, 2017, Mattel filed with the SEC its Form 10-K for the year ended December 31, 2016 (the "Form 10-K"), which was signed by defendants Sinclair, Farr and Johnson. The Form 10-K contained false and misleading disclosures regarding risk factors and disclosure control procedures, as well as defendant Farr's certification thereon.

71.    The statements referenced in ¶¶ 39-54, 59, 61-64, 69 and 70 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) prior to and during the Class Period, Mattel's retail customers were loaded with extremely high levels of unsold

Mattel product; (ii) as a result of Mattel's unusually high levels of unsold inventory at its retailers, Mattel was exposed to the heightened risk that it would have to issue its retailers financial concessions (in the form of sales adjustments, discounts and promotions) to remove such excess inventory, as well as the heightened risk that Mattel would experience slower sales growth in future periods; and (iii) as a result of the foregoing, Mattel's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

72.    On April 20, 2017, post-market, Mattel issued a press release announcing its Q1 2017 financial results, the period ending March 31, 2017.

73.    For the quarter, the Company reported that, on a year-over-year basis, worldwide net sales and gross margins each declined by more than 15%, and its operating loss increased by more than 158% to $127.0 million from $49.1 million.

74.    Mattel's Q1 2017 results took securities analysts by surprise and were significantly below Wall Street consensus estimates. In fact, Mattel's 15% net sales decline during the quarter was twice the 7.8% decline expected by Wall Street analysts and its reported Q1 2017 gross margins were 520 basis points less than expected Wall Street consensus estimates. Moreover, Mattel's revenue decline during Q1 2017 was well above the "mid to high single digit[]" decline propounded by defendant Farr at Mattel's Toy Fair on February 17, 2017, when Q1 2017 was more than half complete.

75.    Mattel's newly appointed CEO, Georgiadis, commented on the Q1 2017 results, stating, in pertinent part, as follows:

> ***"Our Q1 results were below our expectations due to the retail inventory overhang coming out of the holiday period***, but we remain encouraged by strong performance at retail for our key core brands, including Barbie, Hot Wheels and Fisher-Price as well as sustained momentum in high-growth markets like China . . . . We are confident we have worked through the majority of this overhang and look forward to a strong launch of Disney's Cars 3 theatrical release in the second quarter. While we have a lot of work to do to successfully position Mattel for the future, we see a clear runway to improving growth and profitability over time."

(Emphasis added.)

76.    After the issuance of the Q1 2017 earnings release, Mattel held a conference call with securities analysts and investors. During the conference call, defendant Farr stated, in pertinent part, that "[w]hat we didn't expect was ***the prolonged impact from the retail inventory overhang and the resulting slower pace of reorders by retailers, with sales in North America and Europe particularly impacted."*** (Emphasis added.)

77.    Upon these revelations, the price of Mattel stock fell nearly 14%, or $3.42 per share, on heavy trading volume to close at $21.79 per share on April 21, 2017.

78.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

79.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Mattel common shares traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

80.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Mattel common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Mattel or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

81.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

82.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

83.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Mattel;

- whether Defendants caused Mattel to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Mattel securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

84.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

85.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Mattel common shares are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and

- Plaintiff and members of the Class purchased and/or sold Mattel common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

86.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

87.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

# COUNT I

## Violation of Section 10(b) of The Exchange Act and Rule 10b-5
## Against All Defendants

88.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89.    This Count is asserted against Mattel and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

90.    During the Class Period, Mattel and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.    Mattel and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Mattel common shares during the Class Period.

32

92.     Mattel and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Mattel were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Mattel, their control over, and/or receipt and/or modification of Mattel allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Mattel, participated in the fraudulent scheme alleged herein.

93.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Mattel personnel to members of the investing public, including Plaintiff and the Class.

94.     As a result of the foregoing, the market price of Mattel common shares was artificially inflated during the Class Period.  In ignorance of the falsity of Mattel's and the Individual Defendants' statements, Plaintiff and the other members of the Class

relied on the statements described above and/or the integrity of the market price of Mattel common shares during the Class Period in purchasing Mattel common shares at prices that were artificially inflated as a result of Mattel's and the Individual Defendants' false and misleading statements.

95.   Had Plaintiff and the other members of the Class been aware that the market price of Mattel common shares had been artificially and falsely inflated by Mattel's and the Individual Defendants' misleading statements and by the material adverse information which Mattel's and the Individual Defendants did not disclose, they would not have purchased Mattel's common shares at the artificially inflated prices that they did, or at all.

96.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

97.   By reason of the foregoing, Mattel and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Mattel common shares during the Class Period.

# COUNT II

## Violation of Section 20(a) of The Exchange Act
## <u>Against The Individual Defendants</u>

98.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

99.     During the Class Period, the Individual Defendants participated in the operation and management of Mattel, and conducted and participated, directly and indirectly, in the conduct of Mattel's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's inadequate internal safeguards in data security protocols.

100.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Mattel's financial condition and results of operations, and to correct promptly any public statements issued by Mattel which had become materially false or misleading.

101.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Mattel disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Mattel to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Mattel within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the

unlawful conduct alleged which artificially inflated the market price of Mattel common shares.

102.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Mattel.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

# DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 6, 2017

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:(212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com
E-mail: hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*

**Submission Date**

2017-06-28 11:36:46

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.    I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995. 2.  I have reviewed a Complaint against against Mattel Inc. ("Mattel" or the "Company") and, authorize the filing of a comparable complaint on my behalf. 3.   I did not purchase or acquire Mattel securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act. 4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Mattel securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action. 5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Mattel securities during the Class Period as specified in the Complaint. 6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws. 7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court. 8.    I declare under penalty of perjury that the foregoing is true and correct.

Name

**Print Name**

Kari Lathe

Acquisitions

**Configurable list (if none enter none)**

| Date Acquired | Number of Shares Acquired | Price per Share Acquired |
|:---:|:---:|:---:|
| 01/23/2017 | 10 | 30.3499 |
| 01/26/2017 | 10 | 26.25 |

Sales

Documents & Message


(redacted)

**Signature**



**Full Name**

KARI LATHE



(redacted)

**MATTEL, INC. (MAT) (2017)**                                                                 **Lathe, Kari**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|------|------------------|------------------------|------------------------|
| 1/23/2017 | Purchase | 10 | $30.3499 |
| 1/26/2017 | Purchase | 10 | $26.2500 |